UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
                                                                    :

ORVILLE BERNARD GLAZE JR,          :     Case No.:

           Plaintiff,                             :     **COMPLAINT**

      vs.                                             :     **DEMAND FOR JURY TRIAL**

BENEFYTT TECHNOLOGIES, INC., GAVIN : 
SOUTHWELL, PAUL G. GABOS, PAUL E. : 
AVERY, ANTHONY J. BARKETT, JOHN : 
FICHTHORN, ROBERT S. MURLEY, and : 
PEGGY B. SCOTT, : 

          Defendants.                         :
------------------------------------- X

        Plaintiff Orville Bernard Glaze Jr. ("Plaintiff"), by and through Plaintiff's attorneys, allege the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

        1.      This is an action brought by Plaintiffs against Benefytt Technologies, Inc. ("Benefytt" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Benefytt, the "Defendants") for their violations of Sections 14(d)(4) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9 ("Rule 14d-9"). Plaintiffs' claims arise in connection with the proposed tender offer ("Tender Offer") by Daylight Beta Parent Corp., a Delaware corporation ("Parent"), through its subsidiary Daylight Beta Corp.

1

("Merger Sub"), each affiliated with the MDP Funds and advised by Madison Dearborn Partners, LLC (collectively, "MDP"), to acquire all of the issued and outstanding shares of Benefytt (the "Proposed Transaction").

2.  On July 12, 2020, Benefytt entered into an agreement and plan of merger, (the "Merger Agreement"), whereby shareholders of Benefytt common stock will receive $31.00 in cash for each share of Benefytt common stock they own (the "Offer Price").

3.  On July 24, 2020, in order to convince Benefytt's shareholders to tender their shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the Securities and Exchange Commission ("SEC"). In particular, the Recommendation Statement contains materially incomplete and misleading information concerning: (i) the sales process; (ii) the fairness opinion and financial analyses performed by the financial advisors to the Company, BofA Securities, Inc. ("BofA Securities" or the "Financial Advisors"); and (iii) certain financial projections prepared by Benefytt and relied upon by the Financial Advisors.

4.  The Tender Offer is scheduled to expire one minute after 11:59 p.m., Eastern Time, on August 20, 2020 (the "Initial Expiration Date"), or such subsequent date to which the Initial Expiration Date is extended in accordance with the terms of the Merger Agreement (the "Expiration Date"). It is imperative that the material information that has been omitted from the Recommendation Statement is disclosed to the Company's shareholders prior to the forthcoming Expiration Date so they may make an informed determination on whether to tender their shares.

5.  For these reasons, and as set forth in detail herein, Plaintiffs seek to enjoin Defendants from closing the Tender Offer or taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to Benefytt's

shareholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391 as Plaintiff alleges violations of Sections 14(d)(4) and 14(e) of the Exchange Act.

7. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id*. at 1316.

8. Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Benefytt's common stock trades on the NASDAQ Global Select Market (the "Nasdaq"), which is headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

3

9. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Benefytt common stock.

10. Defendant Benefytt is a Delaware corporation and maintains its principal executive office at 3450 Buschwood Park Drive, Suite 200, Tampa, Florida 33618. Benefytt is a health insurance technology company that primarily engages in the development and operation of private e-commerce health insurance marketplaces, consumer engagement platforms, agency technology systems, and insurance policy administration platforms. The Company's common stock trades on the Nasdaq under the ticker symbol "BFYT".

11. Defendant Gavin Southwell ("Southwell") is, and has been at all relevant times, the President and Chief Executive Officer and a director of the Company.

12. Defendant Paul G. Gabos ("Gabos") is, and has been at all relevant times, the Chair of the Board of Directors of the Company.

13. Defendant Paul E. Avery ("Avery") is, and has been at all relevant times, a director of the Company.

14. Defendant Anthony J. Barkett ("Barkett") is, and has been at all relevant times, a director of the Company.

15. Defendant John Fichthorn ("Fichthorn") is, and has been at all relevant times, a director of the Company.

16. Defendant Robert S. Murley ("Murley") is, and has been at all relevant times, a director of the Company.

17. Defendant Peggy B. Scott ("Scott") is, and has been at all relevant times, a director of the Company.

18. The defendants identified in paragraphs 11-17 are collectively referred to as the

"Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

**A. Background and the Unfair Offer Consideration**

19. Benefytt is a health insurance technology company that primarily engages in the development and operation of private e-commerce health insurance marketplaces, consumer engagement platforms, agency technology systems, and insurance policy administration platforms. By leveraging existing and emerging platforms and technologies, Benefytt offers a range of Medicare-related insurance plans from many of the nation's leading carriers as well as other types of health insurance and supplemental products that meet the needs of consumers.

20. The Company derives revenue from two main segments: Individual and Family Plans ("IFP") and Medicare plans. In 2019, the Company derived $314 million in revenue from its IFP segment and just $67.8 million from its Medicare segment.

21. In mid-2019, the Company announced that it was exploring strategic alternatives and in late December 2019, the Company announced that it was de-emphasizing its IFP segment to focus on its Medicare segment.

22. Nonetheless, prior to the MDP merger, Benefytt was poised for excellent growth.

21. Indeed, when the Company released its fiscal 2020 first quarter financial results on May 6, 2020, it issued a press release entitled *Benefytt Technologies, Inc. Reports First Quarter 2020 Results* that assured the investing public that the Company was poised for sustained future growth irrespective of any contractions in the market generally, stating in part:

> Commenting on the Company's first quarter operating results, Gavin Southwell, President and Chief Executive Officer, said, "Compared to many industries, which are significantly impacted by the current environment, our market continues to grow. Our technology-driven model positions us for growth as we help consumers connect with Medicare and other health and life insurance

5

products, something that is now more important than ever, in a safe and easy manner via eCommerce or on the telephone with a licensed agent."

Mr. Southwell continued, "In addition to the Medicare growth potential we are also seeing evolving tailwinds in the IFP market. Building on our success in 2019, 2020 is a year in which we expect to scale the Medicare business. We made good progress on that in the first quarter and are in a strong position for the 2021 annual enrollment period later this year."

22. Indeed, on the May 7, 2020 conference call accompanying the release of these financial results, Southwell reiterated that (i) the Company's "first quarter results show a strong revenue performance despite disruption to the global economy," (ii) the Medicare market "remains a growing and attractive market, and we see the potential for accelerated growth throughout the rest of 2020," and (iii) Benefytt's "model is in a position of strength as our market evolves."

23. Thus, the Proposed Transaction comes at a time when the Company's recent and future success was not fully reflected by its share price, and the Proposed Transaction will cash-out Benefytt's stockholders at a price that fails to adequately compensate them for the intrinsic value of their shares.

24. Despite Benefytt's intrinsic value and exceptional growth prospects, the Individual Defendants are agreeing to sell the Company and deprive its stockholders of the ability to partake in the Company's future growth. The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Offer Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which has caused Plaintiffs and the Class to receive an inadequate Offer Consideration.

**B.     The Proposed Transaction**

25. On July 13, 2020, Benefytt announced the Proposed Transaction in a Press Release entitled *Benefytt Technologies, Inc. to Be Acquired by Madison Dearborn Partners*, which stated in part:

TAMPA, Fla., July 13, 2020 (GLOBE NEWSWIRE) -- Benefytt Technologies, Inc. (BFYT) ("Benefytt") ("the Company"), a health insurance technology company and leading distributor of Medicare-related health insurance plans, today announced that it has entered into a definitive agreement to be acquired by funds affiliated with Madison Dearborn Partners, LLC (the "MDP Funds"), a leading private equity firm based in Chicago that has deep experience in the insurance technology and health care industries. The all-cash transaction is structured as a tender offer of $31.00 per share that will commence in the coming days, followed immediately by a merger.

Gavin Southwell, Benefytt's Chief Executive Officer and President, said, "Over the past year, our Board of Directors and management team have evaluated numerous strategic options to maximize shareholder value and to position the company for its strategic transformation. Following this comprehensive review, we believe Madison Dearborn is the right partner to deliver compelling and certain value to our shareholders. This transaction marks a new stage for the entire Benefytt team, and we look forward to moving ahead with a focus on continuing to offer innovative, technology-enabled services to the people and markets we serve."

The announced transaction with the MDP Funds is the culmination of a process led by Benefytt's Board of Directors since July 26, 2019, to explore, review and evaluate a range of potential strategic alternatives for the Company. The tender offer price per share represents a 59% premium over the 30-day volume-weighted average price per share of Benefytt's common stock through the close of trading on July 10, 2020.

The Company's Board has unanimously approved the acquisition of the Company by the MDP Funds. Following the successful tender of at least a majority of the then outstanding shares of the Company's common stock, the MDP Funds will acquire any remaining outstanding shares of Benefytt's Class A common stock through a merger at a per share price equal to the tender offer price.

"Benefytt's technology-driven model has positioned it well in the evolving Medicare market and we believe we can help Gavin and his team continue to advance Benefytt's product offering and service model," said Vahe Dombalagian, a Managing Director on the Madison Dearborn Financial & Transaction Services team. "Our team has built an extensive resource network and brings significant industry experience, which we look forward to leveraging to support Benefytt. We are pleased to be able to help the Benefytt team fulfill the Company's mission to connect consumers with health insurance and supplemental products that provide people with added security and peace of mind."

Following completion of the transaction, Benefytt will become a private company, substantially owned by the MDP Funds, and will no longer be traded on Nasdaq Global Select Market. Benefytt's management team, including Chief

Executive Officer Gavin Southwell, is expected to continue to lead the Company. The Company plans to maintain its operations in Tampa, Fla.

The closing of the acquisition is expected to occur in the third quarter of this year, subject to the successful tender of a majority of the then outstanding shares of Benefytt's common stock and the satisfaction of other customary closing conditions.

Weil, Gotshal & Manges LLP is serving as legal advisor to Benefytt and BofA Securities is acting as exclusive financial advisor. Kirkland & Ellis LLP is serving as legal advisor to the MDP Funds and SunTrust Robinson Humphrey, Inc. is acting as financial advisor. Committed financing for the transaction is being provided by Truist Bank.

26. Rather than continuing to build upon Benefytt's improving prospects, the Offer Consideration being offered to Benefytt's public shareholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Benefytt common stock is materially in excess of the amount offered given the Company's recent financial performance and its prospects for future growth and earnings.

**C.    The Preclusive Deal Protection Devices**

27. To the detriment of Benefytt shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

28. The Merger Agreement contains a restrictive no-shop provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

29. The no-shop provision also prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to unsolicited proposals regarding alternative acquisitions or business combinations.

30. Further, the Board must provide MDP with written notice of any Acquisition Proposal and must provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal so that MDP has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

31. In addition, the Merger Agreement provides that the Company will be required to pay to Parent a termination fee of $14,700,000.00 to MDP with respect to any termination under the no-shop provisions.

32. Ultimately, these preclusive deal protection devices restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The aggregate effect of these preclusive deal protection devices, viewed in light of the remarkably accelerated negotiation process with MDP and the materially inadequate consideration offered for Benefytt shares in the Proposed Transaction, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

33. Accordingly, Plaintiffs seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

D. **The Recommendation Statement Omits Certain Material Information**

   (i) **The Recommendation Statement Contains Materially False Statements and Omissions Regarding the Process by Which the Board Agreed to Sell the Company**

34. On Pages 27 and 28, the Recommendation Statement states that Benefytt prepared certain unaudited prospective financial information for fiscal years 2019 through 2023 in

connection with the strategic alternative review process in October 2019 (the "October 2019 Projections") and that the October 2019 Projections were "presented to the Company Board during a meeting held in October 2019" but "were not relied upon by the Company Board in approving the Merger Agreement or BofA Securities in rendering its fairness opinion." However, the Recommendation Statement fails to disclose (i) whether the Board actually approved the October 2019 Projections as based on reasonable assumptions, and (ii) whether the October 2019 Projections were provided to BofA Securities. This information is especially material to shareholders because of Benefytt's decision to de-emphasize its IFP segment and increase its focus on its Medicare segment in December 2019. Any reasonable investor would be left wondering whether the Company's transition away from IFP and toward a Medicare model was in fact in the best interests of its shareholders.

35.     Further, the Recommendation Statement states that the October 2019 Projections "were also provided to potential bidders that had entered into confidentiality agreements and expressed interest in conducting due diligence on the Company prior to Benefytt's preparation of the February 2020 Projections described below" but were not provided to "Parent." However, the Recommendation Statement fails to disclose whether the October 2019 Projections were made available to MDP in connection with the indication of interest submitted by Party G, "a portfolio company of MDP" in late September 2019 in order to prompt Party G to increase the range of consideration contemplated in its indication of interest.

36.     Page 15 of the Recommendation Statement states that BofA Securities "provided a relationship disclosure memorandum which was distributed to the Company Board" on October 13, 2019 and that BofA Securities "provided an updated relationship disclosure memorandum which was distributed to the Company Board" on July 2, 2020. However, the Recommendation

Statement fails to disclose what information was "updated" on July 2, 2020, *several weeks after* Benefytt and MDP had effectively agreed to the Offer Price after the *two days* of negotiations, beginning when Benefytt received MDP's non-binding proposal to acquire Benefytt for $30.00 per share on June 9, 2020. This information is obviously material to any investor considering whether to tender their stock because Pages 37 through 38 of the Recommendation Statement state that BofA Securities and its affiliates "derived aggregate revenues from MDP and certain of its affiliates and portfolio companies of approximately $130 million for investment and corporate banking services." Thus, as a result of the unspecified "update," any reasonable investor would wonder whether BofA Securities had been steering the transaction away from other potential counterparties.

**(ii)    The Recommendation Statement Contains False Statements and Omissions Related to the Management Projections and the Fairness Opinion**

37.    The Recommendation Statement also omits material information regarding the Company's Financial Advisors' Fairness Opinion and the various valuation analyses that the Company's Financial Advisors performed to render the opinion because it does not provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion. Specifically, the Recommendation Statement does not disclose enough information regarding the financial projections, inputs and assumptions for various financial valuations, and the Financial Advisors' potential conflicts of interest. Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Offer Price is fair, or accurately assess the reliability of the Fairness Opinion. The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them. Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

38. With respect to the Management Projections, the Recommendation Statement fails to disclose material information. With respect to these financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

39. With respect to the Management Projections beginning on Page 27, the Recommendation Statement fails to provide all of the financial projections prepared by Benefytt and provided to potential counterparties and the Financial Advisors.

40. The Recommendation Statement omits entirely the October 2019 Projections.

41. With respect to the February 2020 Projections, the Recommendation Statement also does not provide projections for after-tax unlevered free cash flows. Further, the Recommendation Statement fails to disclose the following line-items used to determine adjusted earnings before interest, tax, depreciation, and amortization, and the projected pre-tax cash flows (i) interest, (ii) tax, (iii) depreciation and amortization, (iv) cash received as a result of policy premiums, (v) carrier and vendor cash paid, (vi) cash operating expenses, and (vii) earn-outs.

42. With respect to the July 2020 Projections, the Recommendation Statement fails to disclose the following line-items used to determine adjusted earnings before interest, tax, depreciation, and amortization, and the projected unlevered free cash flows: (i) interest, (ii) tax, (iii) depreciation and amortization, (iv) cash received as a result of policy premiums, (v) carrier and vendor cash paid, (vi) cash operating expenses, (vii) stock-based compensation expense, (viii) (one-time items, which include IFP advertising, legal, severance, bonus commissions and

multistate/FTC costs), (ix) taxes payable, (x) capital expenses, (xi) net changes in working capital, and (xii) one-time cash flow items.

43. The Recommendation Statement also omits material information regarding the Financial Advisors' Fairness Opinion and the various valuation analyses performed to render that opinion. The description of the Fairness Opinion fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.

44. With respect to BofA Securities' *Selected Publicly Traded Companies Analysis* beginning on page 34, the Recommendation Statement fails to disclose: (i) the full rationale and criteria that BofA Securities relied on in selecting the companies analyzed, (ii) the individual multiples for the selected companies, and (iii) the full rationale and basis that BofA Securities employed in selecting a range for 2020 EV / Adj. EBITDA multiples of 8.0x to 10.5x and a range for 2021 EV / Adjusted EBITDA multiples of 7.0x to 9.0x.

45. With respect to BofA Securities' *Selected Precedent Transactions Analysis* beginning on Page 35, the Recommendation Statement fails to disclose: (i) the full rationale and criteria that BofA Securities relied on in selecting the transactions analyzed, (ii) the individual multiples implied for each of the selected transactions, (iii) the date each of the selected transactions was announced, and (iv) the full rationale and basis that BofA Securities employed in selecting a range for NTM EV / Adj. EBITDA multiples of 9.0x to 11.0x.

46. With respect to BofA Securities' *Discounted Cash Flow Analysis* (DCF) beginning on Page 36, the Recommendation Statement fails to disclose: (i) the full rationale and basis for selecting a discount rate range of 8.50% to 11.00%, (ii) the rationale and basis for selecting a perpetuity growth rate range of 2.00% to 3.00%, and (iii) a full sensitivity table based on the entire range of discount and perpetuity decline rates. Without this information, it is impossible to

determine whether the discounted cash flow analysis actually provides a reasonable range for the Company's intrinsic value.  Indeed, a banker can make any transaction seem "fair" simply by changing the inputs and assumptions to project and discount future cash flows below the present value of the merger consideration.

## COUNT I
### (Against All Defendants for Violation of Section 14(e) of the Exchange Act)

62. Plaintiffs incorporate each and every allegation set forth as if fully set forth herein.

63. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

64. Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer.  Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65. The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Tender Offer and the intrinsic value of the Company.

66. In doing so, Defendants made untrue statements and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by

virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).  The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

67. The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares.  In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to shareholders.

68. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

69. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiffs, and Plaintiffs will be deprived of her entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

**COUNT II**
**(Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9)**

70. Plaintiffs incorporate each and every allegation set forth as if fully set forth herein.

71. Defendants have caused the Recommendation Statement to be issued with the intention of soliciting shareholder support of the Proposed Transaction.

72. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

73. SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

74. In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

75. The omission of information from a recommendation statement will violate Section 14(d)(4) and Rule 14d-9 if other SEC regulations specifically require disclosure of the omitted information.

76. The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9

because it omits material facts, including those set forth above, that render the Recommendation Statement misleadingly incomplete. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

77. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiffs, and Plaintiffs will be deprived of the right to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Proposed Transaction, until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

B. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiffs rescissory damages

C. Directing the Defendants to account to Plaintiffs for all damages sustained as a result of their wrongdoing;

D. Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

  E. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 5, 2020          **MONTEVERDE & ASSOCIATES PC**

                    By: */s/ Juan E. Monteverde*
                      Juan E. Monteverde (JM-8169)
                      The Empire State Building 350 Fifth
                      Avenue, Suite 4405 New York, NY 10118
                      Tel: (212) 971-1341
                      Fax: (212) 202-7880
                      Email: jmonteverde@monteverdelaw.com

                      *Attorneys for Plaintiff*

**OF COUNSEL:**

**ADEMI & O'REILLY, LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
    jfruchter@ademilaw.com